# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **CHARLES E. WIGGINS, Jr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 10-1410-JWL** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying disability insurance benefits (DIB) and supplemental security income (SSI) under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding no error, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

## I.      Background

Plaintiff applied for both DIB and SSI on February 26, 2007, alleging disability beginning January 7, 2007. (R. 8, 110-18). The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law

Judge (ALJ).  (R. 8, 45-53, 63).  Plaintiff's request was granted, and Plaintiff appeared

with counsel for a hearing before ALJ Michael R. Dayton on January 6, 2009.  (R. 8, 23-

43).  At the hearing, a vocational expert also appeared, but testimony was taken only from

Plaintiff.  (R. 8, 23-43).  After the hearing, Plaintiff was referred both to a consultant

psychologist, Dr. Moeller, for a mental status examination and for psychological testing;

and to a consultant physician, Dr. Estivo, for a physical examination.  (R. 12-13, 343-80).

On September 23, 2009, ALJ Dayton issued a decision finding at step two of the

Commissioner's sequential evaluation process that Plaintiff does not have a severe

impairment or combination of impairments, and denying Plaintiff's applications for

benefits.  (R. 8-16).

       Plaintiff disagreed with the ALJ's decision, and sought (R. 19-22, 44) but was

denied review by the Appeals Council.  (R. 1-4).  Therefore, the ALJ's decision is the

final decision of the Commissioner.  (R. 1); Blea v. Barnhart, 466 F.3d 903, 908 (10th

Cir. 2006).  Plaintiff now seeks judicial review.  (Doc. 1).

## II.    Legal Standard

       The court's jurisdiction and review are guided by the Act.  Weinberger v. Salfi,

422 U.S. 749, 763 (1975) (citing 42 U.S.C. § 405(g)); Wall v. Astrue, 561 F.3d 1048,

1052 (10th Cir. 2009) (same); Brandtner v. Dep't of Health and Human Servs., 150 F.3d

1306, 1307 (10th Cir. 1998) (sole jurisdictional basis in social security cases is 42 U.S.C.

§ 405(g)).  Section 405(g) of the Act provides for review of a final decision of the

Commissioner made after a hearing in which the Plaintiff was a party.  It also provides

that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by

substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine

whether the factual findings are supported by substantial evidence in the record and

whether the ALJ applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084

(10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).

Substantial evidence is more than a scintilla, but is less than a preponderance; it is such

evidence as a reasonable mind might accept to support a conclusion.  Wall, 561 F.3d at

1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).  The court may "neither

reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v.

Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health &

Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395

F.3d 1168, 1172 (10th Cir. 2005).  Whether substantial evidence supports the

Commissioner's decision is not simply a quantitative exercise, for evidence is not

substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.

Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

    An individual is under a disability only if that individual can establish that he has a

physical or mental impairment which prevents him from engaging in any substantial

gainful activity, and which is expected to result in death or to last for a continuous period

of at least twelve months.  Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993)

3

(citing 42 U.S.C. § 423(d)); see also, Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir.

1985) (quoting identical definitions of a disabled individual from both 42 U.S.C.

§§ 423(d)(1) and 1382c(a)(3)(A));  accord, Lax, 489 F.3d at 1084 (citing 42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A)).  The claimant's impairments must be of such severity

that he is not only unable to perform his past relevant work, but cannot, considering his

age, education, and work experience, engage in any other substantial gainful work

existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step sequential process to evaluate disability.  20

C.F.R. §§ 404.1520, 416.920 (2009); Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir.

2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a

determination can be made at any of the steps that a claimant is or is not disabled,

evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting

Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether

claimant has engaged in substantial gainful activity since the alleged onset, whether he

has a severe impairment(s), and whether the severity of his impairment(s) meets or equals

the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt.

P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner

assesses claimant's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e),

416.920(e).  This assessment is used at both step four and step five of the sequential

evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--determining whether claimant can perform his past relevant work; and whether, when considering vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work.  Blea, 466 F.3d at 907; accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy within Plaintiff's capability.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).  Here, the ALJ determined at step two that Plaintiff does not have a severe impairment or combination of impairments.  (R. 10-15).  Therefore, he determined Plaintiff has not been disabled within the meaning of the Act at any time after January 7, 2007, and denied Plaintiff's applications.  (R. 15-16).  The ALJ did not apply steps three through five of the sequential evaluation process, and did not assess Plaintiff's RFC.

Plaintiff claims the ALJ erred in ignoring a CT scan performed on August 14, 2008, improperly discounted the medical opinion of Dr. Muhnall, a physician who examined Plaintiff, and improperly accorded controlling weight to the opinions of non-examining state agency physicians and psychologists.  (Pl. Br. 17-20).  He argues that because of these errors the ALJ failed to recognize that Plaintiff has made the "de minimis" showing required at step two of the sequential evaluation process, and,

therefore, the ALJ's step two finding that Plaintiff has no severe impairment or combination of impairments cannot stand.  (Pl. Br. 17-21).  The Commissioner argues that the ALJ properly considered the August 14, 2008 CT scan, properly discounted the opinion of Dr. Munhall, and did not accord controlling weight to the non-examining state agency physicians.  (Comm'r Br. 5-9).  Therefore, he argues the ALJ properly determined that Plaintiff does not have a severe impairment or combination of impairments, and that substantial evidence in the record supports the ALJ's finding.  Id. 3-9.  The court finds both that the ALJ properly determined at step two of the sequential process that Plaintiff does not have a severe impairment or combination of impairments, and that substantial evidence in the records supports that finding.

## III.    The Step Two Finding

### A.      The Legal Standard Applicable at Step Two

At step two of the sequential evaluation process, the Commissioner determines if Plaintiff has a medically determinable impairment or a combination of impairments that is "severe" and has lasted, or is expected to last for twelve months.  20 C.F.R. §§ 404.1520(a)(4)(ii) (citing § 404.1509), 416.920(a)(4)(ii) (citing § 416.909).  An impairment is not considered severe if it does not significantly limit plaintiff's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1521, 416.921.  The regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs."  Id.  They provide examples of basic work activities including walking,

6

standing, sitting, lifting, pushing, pulling, carrying, handling, seeing, hearing, speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521, 416.921.

The Tenth Circuit has interpreted the regulations and determined that it is a plaintiff's burden to establish a "severe" impairment or combination of impairments at step two of the sequential evaluation process.  Williams, 844 F.2d at 750-51.  A claimant must provide medical evidence that he had an impairment and how severe it was during the time the claimant alleges he was disabled.  20 C.F.R. §§ 404.1512(c), 416.912(c). The required showing has been described as "de minimis."  Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).  "If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  If, on the other hand, the claimant presents medical evidence and makes the de minimis showing of medical severity, the decision maker proceeds to step three."  Williams, 844 F.2d at 751.  Plaintiff need only show that an impairment would have more than a minimal effect on his ability to do basic work activities.  Id.  However, he must show more than the mere presence of a condition or ailment.  Hinkle, 132 F.3d at 1352 (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)). If an impairment's medical severity is so slight that it could not interfere with or have a serious impact on plaintiff's ability to do basic work activities, it could not prevent him

from engaging in substantial work activity and will not be considered severe.  Hinkle, 132 F.3d at 1352.  The determination at step two is based on medical factors alone, and not on vocational factors such as age, education, or work experience.  Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir. 2003).

### B.    The ALJ's Step Two Finding

The ALJ stated his step two finding:  "The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 et seq. and 416.921 et seq.)."  (R. 10) (bolding omitted). In the next five pages, he explained his rationale for the finding.  (R. 11-5)  He listed all of the regulatory examples of basic work activities as cited in the court's statement of the step two legal standard.  (R. 11) (citing Soc. Sec. Ruling (SSR) 85-28).  He stated that he had considered the credibility of Plaintiff's allegations of symptoms in accordance with 20 C.F.R. §§ 404.1529 and 416.929, and SSR's 96-4p and 96-7p; and that he had considered the opinion evidence in accordance with 20 C.F.R. §§ 404.1527 and 416.927, and SSR's 96-2p, 96-5p, 96-6p, and 06-3p.  Id.  He summarized the evidence, including the medical records and reports, Plaintiff's testimony and Plaintiff's other submissions in the record, and the medical opinions.  (R. 11-14).  He found that Plaintiff's allegations of symptoms are not credible.  (R. 14).  He gave no weight to the January 3, 2007 opinion of

Dr. Munhall contained in Dr. Munhall's "Independent Medical Examination" report.  (R. 14).  He stated his agreement with the opinions of Dr. Moeller and Dr. Estivo contained in their "Consultative Examination Reports" dated March 9, May 5, and July 27, 2009, and noted that these reports were consistent with the reports of the state agency medical experts who evaluated Plaintiff's medical condition at the initial and reconsideration levels of review.  Id. (citing Exs. 4F, 6F (R. 256, 263)).[1]  The ALJ also noted that Plaintiff has a medically determinable mental impairment, and explained his application of the Commissioner's psychiatric review technique.  (R. 14-15).  Applying the technique,

_____

[1] The court notes that Exhibit 4F is a finding that Plaintiff's medically determinable physical impairments are not severe which was made at the agency's initial review, and that the form was signed by "P. Johnson" of the Disability Determination Service in Topeka, Kansas on April 17, 2007.  (R. 256) (Form SSA-5002).  Mr. Johnson did not sign the exhibit as an "M.D.," a "Ph.D." or any other acceptable medical source, id., and the "Court Transcript Index" states that the exhibit is a Report of Contact "from KANSAS DDS examiner."  From these facts, it is likely that Mr. Johnson is a state agency Single Decision Maker (SDM) and is not an acceptable medical source.  If that is the case, Mr. Johnson's opinion is not a medical opinion, and is worthy of no weight.  Henderson-Harrison v. Astrue, Civ. A. No. 10-1218-JWL, 2011 WL 1466485, at *5, n.2 (D. Kan. Apr. 18, 2011).  The court need not decide this issue, however, because Plaintiff did not allege error in this regard, and has therefore waived consideration of the issue.  Scott v. Hern, 216 F.3d 897, 910 n.7 (10th Cir. 2000) (the court is "not required to manufacture a party's arguments on appeal when it has failed in its burden to draw our attention to the error below").

In any case, the court notes that Exhibit 6F is an SSA Form 5002 signed on September 26, 2007 at the agency's reconsideration review by "Emil L. Goering, MD." (R. 263).  Dr. Goering is an acceptable medical source whose opinion is a medical opinion, and Dr. Goering stated, "All the evidence in this file is reviewed and the 5002 signed 4/12/07 is affirmed as written."  Id.  Because Dr,. Goering affirmed Mr. Johnson's opinion, even if Mr. Johnson is not an acceptable medical source, Plaintiff can show no harm resulting from the ALJ's erroneous consideration of Mr. Johnson's opinion as a medical opinion.

the ALJ found that Plaintiff has no limitations in activities of daily living, no limitations in social functioning, slight limitations in concentration, persistence, or pace, and no episodes of decompensation. (R. 15). In accordance with application of the technique, the ALJ found that Plaintiff's mental impairment is not severe because it "causes no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area." Id.

### C.    Analysis

Plaintiff points to the report of a CT scan performed on August 14, 2008, after Plaintiff was involved in a motor vehicle accident, and argues that report indicated "the possibility of a non-displaced fracture" in Plaintiff's lower thoracic spine. (Pl. Br. 20) (citing R. 303). Plaintiff argues that the ALJ made a medical decision that this evidence was irrelevant, and ignored the report in his decision, thus ignoring the "potential real basis of Plaintiff's ongoing allegations of chronic and severe pain." (Pl. Br. 20). The Commissioner points out that the report indicating the possibility of a fracture was the report of a CT scan of Plaintiff's abdomen and pelvis, but that the next day a CT scan was performed on Plaintiff's thoracic spine which was negative. (Comm'r Br. 5-6). The Commissioner argues that substantial record evidence supports the ALJ's finding that CT scans of Plaintiff's cervical, thoracic, and lumbar spines were negative. Id.

As the parties appear to agree, the record shows that after a motor vehicle accident, Plaintiff was given a CT scan of his abdomen and pelvis at 9:38 p.m. on August 14, 2008.

10

(R. 303) (Ex. 8F, p.16).  The report showed an "Admitting Diagnosis" of thoracic spine fracture and abdominal pain after a motor vehicle crash.  Id.  Dr. Larry Graham interpreted the CT scan.  His report indicated the following findings and impression:

> FINDINGS:  The lung bases are clear.  The liver, spleen, pancreas, adrenals, and kidneys are unremarkable.  There is a focal linear lucency seen through the T10 and T11 vertebral bodies.  While this may be a draining vein, the possibility of a nondisplaced fracture cannot be excluded.  The remainder of the osseous structures is unremarkable.  There is no pelvic mass, adenopathy, or free fluid.

> IMPRESSION:  Linear lucency seen in the T10 and T11 vertebral bodies.  While these may be secondary to draining veins, a possibility of a nondisplaced fracture cannot be entirely excluded.  Recommend clinical correlation.

> No other acute abnormality in the abdomen or pelvis.

(R. 303).  The conclusions to be gleaned from this report, are that this CT was intended to evaluate Plaintiff's abdomen and pelvis, that there was no definite acute abnormality in the abdomen or pelvis, that there was a linear lucency in the T10 and T11 vertebral bodies which could result from either draining veins or a nondisplaced fracture, and that clinical correlation was recommended to determine whether there was a nondisplaced fracture.

Shortly after 7:30 a.m. the next morning, Plaintiff was given CT scans of the cervical spine and of the thoracic/lumbar spine.  (R. 304-05) (Ex. 8F, pp.17-18).  On these reports, the "Admitting Diagnosis" was a thoracic spine fracture after a motor vehicle crash.  Id.  The "Impression" was given as "Negative CT of the cervical spine" (R. 304), and "Negative CT of the thoracic and lumbar spine."  (R. 305).

11

The ALJ and Plaintiff's counsel discussed this very issue at the hearing:

ALJ:      Do we have any records showing anything -- any new injuries as a result of this recent --

ATTY:     Well, 8F is the hospital he went to after the accident; and then, Mid-America Orthopedics is where he's going now. They're doing physical therapy.  And then, after he does four or six weeks of that, they'll re-assess what's going on.  Via Christi, there was a possible T-spine fracture, and they said they needed to do clinical correlation on that.  And then, I never saw anything after that.

ALJ:      Well, there were CT scans done --

ATTY:     Um-hum.

ALJ:      -- in 8F.

ATTY:     That's what I'm referring to.

ALJ:      I thought they were (INAUDIBLE)

ATTY:     The, the first one in my file -- let me find the page.  It says, "Linear lucency seen in T10-T11.  May be secondary to draining veins, but possibility of nondisplaced fracture cannot be excluded."

ALJ:      Which page was that?

ATTY:     Let me find it for you.  Okay, that is on 16 in 8F.

ALJ:      Okay.

ATTY:     In the findings -- oh, the impression.

ALJ:      This was the CT that was done on May 14, '08 of the pelvis/abdomen area, right?

| | |
|---|---|
| ATTY: | That's what it says at the top.  But then, it talks about this T10- |
| ALJ: | Okay. |
| ATTY: | T11. |
| ALJ: | But wasn't there another set of - |
| ATTY: | Um-hum, right after that. |
| ALJ: | The one done on 8/15? |
| ATTY: | Um-hum, yeah. |
| ALJ: | It says, "Negative CT of thoracic lumbar spine?" |
| ATTY: | That's right.  And then, Dr. Hefferd (Phonetic) is at MidAmerica Orthopedics.  He did an exam, and that would be in 9F. |

(R. 40-41).  In this dialogue, the ALJ explained his view that the CT scan on the first day was of the pelvis/abdomen area, and the scan of the thoracic lumbar spine on the next day clarified that there was no fracture in the thoracic spine despite the possibility of a fracture which had been recognized in the CT scan of the abdomen/pelvis.  Counsel admitted, "That's right."  (R. 41)  But he noted that Plaintiff was later examined by Dr. Hufford at MidAmerica Orthopedics.  (R. 41).  In the decision, the ALJ did not mention the pelvis/abdomen CT scan, but noted that CT scans "of the cervical, thoracic and lumbar spine were obtained and found to be negative."  (R. 12) (citing Ex. 8F, pp.17-18).

It is not clear why counsel referred to Dr. Hufford's exam, because that exam does not help his argument.  Dr. Hufford examined Plaintiff for the first time on December 8,

13

2008, almost four months after the motor vehicle crash, and he did not diagnose any fracture of the thoracic spine.  Rather, he diagnosed Plaintiff with a motor vehicle crash "with primary <u>myofascial injury</u> to the <u>cervical</u> and <u>lumbar</u> spine.  (R. 325) (Ex. 9F, p.4) (emphasis added).  Dr. Hufford diagnosed injury to the cervical and lumbar spine rather than to the thoracic spine as would be the case if the possibility revealed by the pelvis/abdomen CT scan were borne out.  Moreover, the injury diagnosed by Dr. Hufford was to the connective tissue rather than to the bones of the spine.  Myofascial pain "is a kind of ongoing or longer-lasting pain that can affect the connective tissue (fascia) of a muscle or group of muscles."  "Myofascial Pain Syndrome," WebMD (available online at http://www.webmd.com/a-to-z-guides/myofascial-pain-syndrome-topic-overview) (last viewed January 16, 2012).

As the discussion above reveals, substantial record evidence supports the ALJ's finding that CT scans of the cervical, thoracic, and lumbar spine were negative.  In context, and in light of the evidence as discussed above, the CT scan of Plaintiff's pelvis/abdomen to which Plaintiff appeals, and which suggested the possibility of a non-displaced spinal fracture is neither uncontroverted nor significantly probative evidence, and Plaintiff has shown no error in the ALJ's failure to discuss that evidence in the decision.  <u>Threet v. Barnhart</u>, 353 F.3d 1185, 1190 (10th Cir. 2003) (ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects); <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (same).

Plaintiff also argues that the ALJ improperly discounted the opinion of Dr. Munhall, who had performed an independent medical examination of Plaintiff, and that the ALJ made an ambiguous finding that Dr. Munhall's opinion is "not consistent with the rest of the medical record."  (Pl. Br. 18) (quoting without citation).  He argues that if the examination were properly assessed, it would reveal residual neck and back pain resulting in Permanent Modified Duty for Plaintiff and restrictions in Plaintiff's abilities which would at least satisfy the "de minimis" standard used at step two to show a severe impairment.  (Pl. Br. 17-19).  Plaintiff concludes this argument by stating that the "ALJ discounted Dr. Munhall's opinion simply because it was not in line with the thrust of a denied claim -- that is, it pointed to disability and had to be muted in order to deny the claim!"  (Pl. Br. 19).  The Commissioner argues that Dr. Munhall's opinion was properly considered and discounted because:  Plaintiff was working when the opinion was formulated, the examination occurred before Plaintiff's alleged onset date, the opinion was not supported by Dr. Munhall's examination findings, and the opinion was not supported by the record as a whole.  (Comm'r Br. 6).

The ALJ summarized Dr. Munhall's examination and report:

The claimant presented to Dr. Munhall on January 3, 2007 for an evaluation in connection with an insurance claim.  The examination was unremarkable with the impression of neck and low back pain.  The claimant reported some tenderness with the examination revealing normal and symmetrical bilateral upper and lower extremity appearance, bulk strength sensation and deep tendon reflexes.  He had a mild loss of lumbar rotation and flexion. The doctor noted a 10 percent whole person permanent partial impairment of function with work capacity to avoid static, repetitive cervical flexion,

extension; occasional bend, squat, stoop, lift, carry, trunk rotation;
maximum occasional lift, carry, push-pull 30 pounds, 10 pounds frequently.
The doctor estimated future medical expenses to be a TENS unit of $1500,
medication management of $100 a month and gym/pool program of $500.
(exhibit 2F) [(R. 243-48)].

(R. 12).

He later discussed Dr. Munhall's opinion in relation to Plaintiff's allegations and

the other record evidence:

Although the claimant has alleged an inability to sustain work, this is not
supported in a review of the evidence.  He was involved in a motor vehicle
accident on December 19, 2005 and August 14, 2008.  Although Dr.
Munhall reported some limitations in January 3, 2007, this was before the
claimant last worked or alleged impairment.  There have been no limitations
provided since that date.  X-rays of the cervical, thoracic and lumbar spine
have been unremarkable.  The consultative examination in September 2007
was unremarkable.  The most recent examination with Dr. Estivo on July
27, 2009 specifically reported no objective evidence of any impairment and
no work restrictions.  This was based on a review of all the evidence and an
examination of the claimant.

(R. 14).  He concluded that Dr. Munhall's limitations should be given no weight, stating

"they are not supported in a review of his records or the evidence as a whole." Id.

It is significant to note that Dr. Munhall is not a treating source as defined in the

regulations.  Therefore, his opinion is worthy of no special consideration beyond that of

any acceptable medical source who has examined Plaintiff.  Doyal v. Barnhart, 331 F.3d

758, 762-63 (10th Cir. 2003).  In fact, no treating source has provided an opinion

regarding limitations in work abilities in this case.  Therefore, the ALJ was considering

and weighing opinions from three non-treating (examining) sources, Drs. Munhall,

16

Moeller, and Estivo, and two non-examining (reviewing) sources, Mr. Johnson and Dr. Goering.  In such a case, the opinions of non-treating sources are generally worthy of greater weight than the opinions of non-examining sources.  Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

Where a treating source opinion is not given controlling weight, all medical opinions will be evaluated in accordance with certain regulatory factors.  20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2011).  Those factors are:  (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003); 20 C.F.R. §§ 404.1527(d)(2-6), 416.927(d)(2-6); see also Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001).

As the ALJ noted, Dr. Munhall's opinion was formulated before Plaintiff ceased working, and before he alleges onset of disability.  No doctor who has examined Plaintiff since Dr. Munhall's examination has proposed any work limitations. (R. 249-55, 257-62, 288-380).  The medical tests and examinations in the record, other than the singular opinion of Dr. Munhall, have been unremarkable and have proposed no work restrictions. Id.  As quoted and cited above, the ALJ explained all of this, but Plaintiff argues that the ALJ failed to point out or detail the inconsistencies upon which he relied.  Moreover, Plaintiff's summary of Dr. Munhall's opinion (Pl. Br. 19) is essentially the same as, but much less detailed than, the ALJ's summary.  (R. 12).

Moreover, as quoted above, Plaintiff argues that the "ALJ discounted Dr. Munhall's opinion simply because it was not in line with the thrust of a denied claim -- that is, it pointed to disability and had to be muted in order to deny the claim!"  (Pl. Br. 19).  Counsel's argument on behalf of Plaintiff implies that the ALJ was somehow deliberately biased.  But, he ignores the rationale given by the ALJ in discounting Dr. Munhall's opinion, and he points to no evidentiary basis for his assertion that the opinion was rejected merely because the ALJ wanted to mute it in order to deny the claim. Plaintiff has shown no error in the ALJ's rejection of Dr. Munhall's opinion, and as discussed above, substantial record evidence supports that determination.

Plaintiff argues that the ALJ apparently accorded controlling weight "to the non-examining DDS reviewers in siding with them in determining that Claimant's mental

and/or physical impairments are 'non-severe.'" (Pl. Br. 17).  The Commissioner argues that the ALJ did not give controlling weight to any medical opinion, but instead considered the record as a whole and stated his agreement with the opinions of Dr. Moeller and Dr. Estivo, and stated that these opinions were consistent with the opinion of the state agency medical consultant who reviewed the record evidence and found no severe impairments.  (Comm'r Br. 8-9).

Plaintiff quotes from the decision regarding the weight the ALJ accorded to the medical opinions of Drs. Moeller and Estivo, and to the medical opinions of the "medical experts at the lower level:"

> The undersigned agrees with the opinions of Dr. Moeller and Dr. Estivo finding the claimant has no severe physical or mental impairment.  This is also consistent with the medical opinions of the medical experts at the lower level finding the claimant does not have a severe impairment (exhibit 4F, 6F) [(R. 256, 263)].  Although they did not examine the claimant, they provided specific reasons for their opinions about the claimant's residual functional capacity showing that they were grounded in the evidence in the case records, including careful consideration of the claimant's allegations about symptoms and limitations.

(Pl. Br. 17) (quoting R. 14).  However, Plaintiff did not discuss the ALJ's earlier summary and discussion of the reports of Dr. Moeller and Dr. Estivo.  (R. 12-13).  In that summary, the ALJ noted that Dr. Moeller indicated Plaintiff was "claiming more impairment than objectively exists," found "no psychological difficulties that would preclude employment," felt malingering needed to be ruled out, and found "no impairment in the ability to understand, remember and carry out instruction and only

19

slight limitation in the ability to respond appropriately to work pressures in a usual work setting with no other problem in the ability to respond appropriately to supervision, co-workers and work pressures in a work setting." (R. 12-13) (citing Ex. 11F (R. 343-54)). The ALJ discussed intelligence testing that Dr. Moeller administered to Plaintiff, noted the test results were not consistent with other records or with Plaintiff's ability to read, and that the test results were invalid and "supported the claim of malingering." (R. 13) (citing Ex. 12F (R. 355-71)). Finally, the ALJ summarized Dr. Estivo's report of examination, noting that it was unremarkable, that Dr. Estivo "found no objective evidence for which to attribute [Plaintiff's] complaints of pain," "would not recommend any specific work restrictions," and completed a functional assessment "finding no limits in lifting, sitting, standing, walking, postural limitations, manipulative limitations, visual/communicative limitations, or environmental limitations." (R. 13) (citing Ex. 13F (R. 372-80)). Finally, in the sentence immediately following the portion of the decision quoted by Plaintiff, the ALJ found that the evidence received into the record after the reconsideration evaluation of Dr. Goering would not alter any findings the lower level medical experts made regarding RFC. (R. 14).

Plaintiff's brief is confusing regarding the opinions to which he believes the ALJ apparently accorded controlling weight, because he alleges the ALJ "assigned ostensible controlling weight to the non-examining DDS reviewers," but he quotes the portion of the decision in which the ALJ states his agreement with the opinions of Dr. Moeller and Dr.

20

Estivo.  (Pl. Br. 17).  Several terms need to be discussed in order to untie this knot.

"DDS" refers to the state agency, Disability Determination Service, which in Kansas

reviews applications for DIB and SSI at the initial and reconsideration levels of review.

20 C.F.R. §§ 404.1601-02, 404.1610-19; 416.1001-02, 416.1010-19.  Thus, the "non-

examining DDS reviewers" as used by the Plaintiff, refers to DDS consultants who did

not examine Plaintiff but formed opinions based upon a review of the record evidence.

Similarly, the "medical experts at the lower level" as used in the ALJ's decision refers to

the "medical or psychological consultants" "who [are] member[s] of a team that makes

disability determinations in a State agency."  20 C.F.R. §§ 404.1616; 416.1016.

Therefore, the "non-examining DDS reviewers" and the "medical experts at the lower

level" refer to the same individuals, the state agency consultants who did not examine

Plaintiff but reviewed the record evidence and provided medical opinions based thereon.

The ALJ cites to these opinions at Exhibits 4F and 6F, and a review of the exhibits

reveals they are opinions provided by Mr. Johnson (R. 256) and Dr. Goering.  (R. 263).

On the other hand, the ALJ, stated that he agreed with the opinions of Dr. Moeller

and Dr. Estivo who were non-treating physicians who had, in fact, examined Plaintiff and

provided opinions based upon the results of those examinations.  See, (R. 12-13)

(summarizing the opinions and reports of Drs. Moeller and Estivo); and (R. 343-80)

(reports from Drs. Moeller and Estivo).  As to the opinions of the "medical experts at the

lower level" (Mr. Johnson and Dr. Goering), the ALJ merely noted that their opinions

were consistent with those of Dr. Moeller and Dr. Estivo, and were grounded upon the record evidence and upon careful consideration of Plaintiff allegations, and that new evidence received later would not discount their findings.  Although Plaintiff apparently (erroneously) conflates all of these opinions under the rubric "non-examining DDS reviewers," that error makes no difference in the court's analysis because the court finds that the ALJ did not give controlling weight to any medical opinion.

As Plaintiff's brief recognizes, "controlling weight" is a term of art used by the Commissioner in weighing treating source opinions.  (Pl. Br. 17).  "If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2011) ("Giving Controlling Weight to Treating Source Medical Opinions").  SSR 96-2p makes clear that controlling weight can be given only to the medical opinion of a treating source, and only when the opinion is both "well supported by medically acceptable clinical and laboratory diagnostic techniques," and "'not inconsistent' with the other substantial evidence in the case record."  SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111, 112-13 (Supp. 2011).  "If a treating source's medical opinion is well-supported and not inconsistent with the other substantial

22

evidence in the case record, it must be given controlling weight; i.e., it must be adopted."
Id. at 111.  If a treating source opinion is given controlling weight, the other medical
source opinions will not be weighed in accordance with the regulatory factors, and the
relative weight between them need not be assessed--the treating source's opinion is
controlling.  20 C.F.R. §§ 404.1527(d); 416.927(d) ("we consider all of the following
factors in deciding the weight we give to any medical opinion" "unless we give a treating
source's opinion controlling weight").

From this discussion, it becomes apparent that "controlling weight" has a specific
meaning and is not merely the quantum of weight given to an opinion which carries the
greatest weight in the ALJ's analysis or with which the ALJ agrees.  Controlling weight
can only be accorded to a treating source opinion.  Here, there was no treating source
opinion.  Therefore, it is not surprising that the ALJ said nothing in his decision regarding
controlling weight.  Rather, as discussed above he considered Dr. Moeller's opinion and
Dr. Estivo's opinion and described how those opinions were consistent with the record
evidence.  He then explained that he agreed with the opinions and that the opinions were
consistent with the state agency consultants' opinions which he noted were grounded in
the evidence and in careful consideration, and which were not inconsistent with the
evidence received after the consultants' opinions were formulated.  Contrary to Plaintiff's
argument, there is simply no indication in the decision that the ALJ adopted the DDS

opinions or the opinions of Dr. Moeller and Dr. Estivo <u>as controlling</u>.  Moreover,

substantial evidence supports the weight assigned to these opinions by the ALJ.

Plaintiff argues that the ALJ erred in finding Plaintiff's impairments are not severe

because the ALJ erroneously assigned controlling weight to certain opinions, erred in

weighing Dr. Munhall's opinion, and erred by ignoring the pelvic/abdomen CT scan

performed on August 14, 2008.  As the discussion above demonstrates, Plaintiff has not

shown error in the findings upon which he bases his argument.  Therefore, the court finds

that Plaintiff has not met his <u>de minimis</u> burden at step two.  He has not established that

his impairments have more than a minimal effect on his ability to do basic work activities.

Plaintiff has shown no error in the ALJ's decision.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the

fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 18th  day of January 2012, at Kansas City, Kansas.


<u>s:/ John W. Lungstrum</u>
**John W. Lungstrum**
**United States District Judge**

24